UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROBERT MONACO,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF NEW YORK ET AL.,<br><br>Defendants. | . | Docket No. 1:25-cv-01387-NCM-VMS<br><br>Brooklyn, New York<br>Thursday, November 6, 2025 |

TRANSCRIPT OF TELEPHONIC CONFERENCE
BEFORE THE HONORABLE VERA SCANLON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff: Menken Simpson & Rozger LLP
SCOTT E. SIMPSON, ESQ.
SAM SALINGER, ESQ.
225 Broadway
Suite 920
New York, New York 10007
212-509-1616

For the Defendants: New York City Law Department
HAYLEY BRONNER, ESQ.
100 Church Street
Suite Second Floor
New York, New York 10007
212-356-2460

Transcription Service: Superior Reporting Services LLC
P.O. Box 5032
Maryville, TN 37802
865-344-3150

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

P R O C E E D I N G S

THE COURT: This case is Monaco vs. City University of New York et al., 25-cv-1387.

So let's start with counsels' appearances.

MR. SIMPSON: Good afternoon, Your Honor. For Mr. Monaco, this is Scott Simpson, along with my colleague, Sam Salinger, from Menken Simpson & Rozger LLP.

THE COURT: Hello.

MS. BRONNER: Good afternoon. This is Hayley Bronner, Assistant Corporation Counsel for Defendants.

THE COURT: Okay. All right. So let's just start with a brief overview of the claims, and also what the Plaintiff's current relevant circumstances are, and then any thoughts about starting settlement discussions. And then Defendants' position, settlement-related thoughts, and then we'll talk about discovery.

MR. SIMPSON: Sure, Your Honor. This is Scott Simpson. This is essentially a failure to accommodate disability discrimination and retaliation case.

Our client, Robert Monaco, was, for over 10 years, a senior college laboratory technician at Kingsborough Community College. He was essentially the guy who built all the sets for the theatrical productions, worked with students, taught an adjunct class in set building, and he did that for many years.

At a certain point, he could not do certain, only just a few parts of the job, without experiencing pain, due to some injuries that he had that are spelled out in the complaint. He asked for a reasonable accommodation, which in our view would only require very little commitment of resources from CUNY, from KCC. And instead of accommodating him, they changed his job description, essentially relegating him to an office worker or a techie, and they stripped him of his adjunct position. And on that arm of the complaint, the EEOC found probable cause.

So he is seeking mostly emotional distress damages at that point. His economic damages are somewhat limited. He remains employed by CUNY. He has claims under the Section 504 of the Rehabilitation Act, the ADA, the State and City Human Rights Law.

And in terms of settlement, the parties did have settlement discussions when the case was in the EEOC, but ultimately, those discussions, it did not work out. We made some progress, but it did not work out. And I don't see right now any prospect for settlement, but of course, if Defendants are interested, we would be all ears.

Is there anything else the Court would like me to address?

THE COURT: So what's your client's current employment situation?

MR. SIMPSON: Right. He continues to be employed by CUNY. He lost his adjunct position, but he remains a CLT. And my understanding is he sits in an office and does sort of menial tasks.

THE COURT: Did he lose income, besides the adjunct teaching position?

MR. SIMPSON: He did not.

THE COURT: All right. And what accommodations do you think could work, going forward, if you were able to reinvigorate these possible discussions for settling?

MR. SIMPSON: So it would be, our estimate was approximately six to nine hours of physical help over the course of the semester, helping him do heavy lifting, which is taking down risers, putting in platforms, and installing walls. These are not done on a daily basis, they are scheduled in advance, they're done, I think, twice per play that they put on, and I think they do two plays a year. And he can do everything else. And he would obviously want to be restored to his adjunct position as well.

I don't think that CUNY wants to do that, based on my prior settlement discussions, but that would obviously clear a path to resolution if they would restore, you know, his work.

THE COURT: And the person who is doing that work now, it's part of a bigger job, or what's happening?

MR. SIMPSON: I'm not 100 percent sure. It might be something that Defendants could better answer.

THE COURT: Okay.

Okay. How about Defendants? What is your client's position on the merits? And then thoughts about settlement discussions if they get going.

MS. BRONNER: Thank you, Your Honor. Defendants' position is that any actions taken here were for nondiscriminatory, non-retaliatory reasons. The Plaintiff was employed in two separate positions at CUNY, and one of them, as opposing counsel said, was a position in the --

THE COURT: Hang on a second. Hold on. Sorry. You're line is breaking up, and whoever is typing, if you could mute yourself, because it's making a lot of noise in the background.

Okay. So, I'm sorry. I don't know what happened, but I couldn't hear you when you were speaking, so if you don't mind starting again.

MS. BRONNER: Yes. Defendants' position is that any actions taken here were for nondiscriminatory, non-retaliatory reasons. The Plaintiff was employed by CUNY in two separate positions. As opposing counsel said, there was the CLT position, and then separately the Adjunct Professor position. Which the CLT position is his full-time position, the Adjunct Professor position was part-time, and

subject to re-appointment every semester. And for nondiscriminatory and non-retaliatory reasons, he was not reappointed for the following semesters for his adjunct position.

In the CLT role, he requested the accommodation to not do heavy lifting. And they did just that, they removed those things from his job and they had, I believe, they either hired somebody else or designated somebody else to do that heavy lifting that he said he could not do.

So he continued in the same CLT role, just modifying the heavy-lifting aspect, just as he asked, so he was accommodated. And then separately, he was not reappointed for an adjunct role, unrelated to his accommodation request.

THE COURT: Okay. So going back to Plaintiff's claims, what's your response to what the corp. counsel said?

MR. SIMPSON: Yes, Your Honor. They completely changed his job. I cannot get my head around this argument that he was accommodated. They shoved him into an office doing menial tasks. His job was to be on set, working with the students, designing the set for 10 years. Now, they're claiming that they accommodated him by putting him in an office and making him write a handbook. It doesn't make any sense to me. They fundamentally changed the terms of his employment and his job, and effectively punished him. If

that was not the case, we would likely not be here because he'd be doing his job.

So that's my response.

THE COURT: Can we go back? Let's just spend a little more time on the details. How is he not doing his job? He doesn't want to do, says he can't do the heavy lifting. So which other parts of the job is he not doing and/or someone else is doing instead of him?

MR. SIMPSON: His entire job is to be on the set with the students, directing them, designing the set, working on the set, which he can do the vast majority of the physical tasks required to work on the set. So that was his job for 10 years. After the reasonable accommodation request, he was stripped of his adjunct position, which is undisputed, and then he is no longer on set with the students. He sits in an office, he works on the handbook, he hands out props, I believe, sometimes, and he basically doesn't do a whole lot. It's almost pretty close to a rubber-room type situation.

THE COURT: Okay. But you said that the theater is on twice a year, it's two productions; is that right?

MR. SIMPSON: I believe so, Your Honor.

THE COURT: And so, like, what's happening with those productions, in terms of any set that they need? Is someone else doing it?

MR. SIMPSON: Yes. I'm sorry, Your Honor. Yeah.

Yes, somebody else is doing that job, yes.

THE COURT: And they're doing all of the work, not just the heavy lifting, is that the idea?

MR. SIMPSON: I don't know exactly what they're doing, but he's been essentially replaced by somebody else who is working with the students, and designing the sets, and doing all the things he did, you know, during his years in that job.

THE COURT: Okay. So from the adjunct point, how is it connected? I mean, adjunct's job doesn't involve --

MR. SIMPSON: Is that a question for me?

THE COURT: Yeah, for Plaintiff. The adjunct's job doesn't involve any heavy lifting, it doesn't seem like that is something related to the accommodation. So is the argument just temporal proximity, he asked for an accommodation and then he lost that job?

MR. SIMPSON: Well, yes. But --

THE COURT: I mean, he didn't ask for accommodation -- let me just finish.

Did he ask for an accommodation that would affect the adjunct's position, it would only affect the other part, or are they intertwined? I mean, just to understand.

MR. SIMPSON: They're somewhat intertwined, Your Honor, because part of the adjunct position is teaching the children -- teach the children, I must be getting

old -- teaching the students, these college students, on set. So it's not exclusively, you know, a classroom setting where he's showing them how he designs the sets and teaching them set design.

So Your Honor is correct, the two positions are intertwined.

THE COURT: So would the accommodation request have affected any aspect of the teaching that he did as part of the adjunct job?

MR. SIMPSON: Part of the teaching? Well, no, because --

THE COURT: Well, I mean, the adjunct role. You're basically saying, you are saying, he says he can't do heavy lifting. So in the role as an adjunct, would he have had to do heavy lifting?

MR. SIMPSON: Well, technically, he's really not supposed to be doing any heavy lifting, period. But as a matter of practice, that was something he did very sparingly, as part of the job. But I don't want to dodge your question, Your Honor. Yes, that is, I think, part of the adjunct responsibilities. Although again, if they just would have somebody come over and do some of the heavy lifting a couple of times a semester, then this problem would be solved. But they're not willing to do that.

THE COURT: Okay. Let me ask a different question.

I don't know if, corp. counsel, you don't know the answer, or you're being polite and avoiding saying it, or if there's some other issue. But from the college's perspective, why did he lose the adjunct's position?

MS. BRONNER: Yes, Your Honor. He was not reappointed for the adjunct role due to performance and professionalism reasons. And I think over time, there were many issues that came to light, and that's why he was not reappointed.

And also, just to clarify some of what's been said. The two roles were somewhat intertwined in that they both related to the set. But they were distinct in that essentially, as the adjunct professor for this practical course, he designed the sets, and that was part of the adjunct role.

And then as a CLT, the job, again, CLT means college laboratory technician. So the CLT was building the sets. So when he was not reappointed as adjunct, he was no longer -- part of his role was no longer to design the sets. And I believe opposing counsel was focusing quite a bit on that design aspect, and the fact that they were two distinct roles, and designing was part of the adjunct portion, kind of clarifies why he would no longer be doing that and why the accommodation request related specifically to the CLT role.

THE COURT: Okay. I'm going to ask a couple other

questions. Cases involving academic appointments are often quite complicated. So it sounds like Plaintiff, I mean, I don't know, maybe from the EEO he knows this was the college's position. But to the extent you all have not exchanged, you know, very frankly what the bases for the nonrenewal or non-reappointment were, it seems like that conversation should move forward.

And then another question, are the faculty unionized?

MR. SIMPSON: I can answer that, Your Honor. Yes, he is in a union. He is in PSC.

THE COURT: Because usually, or often, reappointment and tenure or tenure-adjacent kinds of decisions, are part of a grievance process. Did that happen here?

MR. SIMPSON: There is an ongoing grievance process, but it excludes the claims that he is litigating before this Court. There are other grievances that he has brought.

And I don't believe -- Your Honor, I apologize for not knowing the exact answer to this question. I do not know, off the top of my head, and I do not think he is grieving the -- I do not believe the removal of his adjunct position is grievable [sic].

THE COURT: Okay.

MR. SIMPSON: I believe that the other stuff is, but I do not believe that's covered.

THE COURT: All right. And then the other -- well, I don't know the answer.

The other question is, often non-reappointments for CUNY, are addressed in State Court through Article 78, with similar proceedings. Has that happened here at all?

MR. SIMPSON: No, Your Honor.

THE COURT: All right. Any thoughts on information on the Defendants' side, with regard to the procedural issues here?

MS. BRONNER: Yes, Your Honor. So the Plaintiff does have four pending grievances. And I believe when we filed our original pre-motion letter, back, I think, early in the summer, we had also asked for the case to be stayed, pending those grievances, because the claims do overlap.

I have not been told that they have been kind of separated and anything that does overlap was withdrawn. Last I heard from my client was that there were overlapping claims.

THE COURT: Okay. But, I guess, do you still think discovery should be stayed with that motion, and why, particularly why with regard to the grievances or any other proceedings that's happening?

MS. BRONNER: So I know that the District Judge had

denied our motion to stay the case on that basis. We haven’t renewed that request. I would have to check in with my client again just to confirm the present status of it, and to confirm that those claims that were overlapping are still involved in the grievance. I believe that arbitration is scheduled -- or the hearing for that is scheduled, for all four, is scheduled for January.

MR. SIMPSON: Your Honor, may I just chime in?

THE COURT: Uh-huh.

MR. SIMPSON: So I've spoken with Mr. Monaco and the Union about this. Their intention was not to move forward on the claims that overlap with this case, because Mr. Monaco wanted to litigate those in court.

So I'm actually going to be speaking with his lawyer tomorrow, with regards to the arbitration. So I would be happy to provide opposing counsel an update with regards to that. But my understanding is that the claims before this Court are not being pursued in the arbitration. The grievances are about other issues.

THE COURT: Okay. I think it's often hard to draw that clear a line, right? Maybe it's working, but, you know, this is a, it depends on many possibilities. But a very common situation, in university-related and academic-related situations, is these ancillary proceedings have some estoppel value. Things, you know, can go either way, in favor or

against the academic person or the academic institution.

So I think it's -- but I think it's really important that both of you have a handle on what is going on there. And to the extent that there are negotiations as to any of those issues and/or there could be negotiations here, it would seem like a good idea to wrap it all together. But I guess it seems to be important that the Plaintiff know, from the university's perspective or college's perspective, the reasons why he's terminated from the academic position, because if that, in any way, is a subject of fact-finding in any of those proceedings, it could impact this case. Which is not to say you need to put this on hold, it's to say that I think all of this needs to be coordinated and you should all know what's going on across the board.

All right. So let me ask one last question about the possibility of having settlement discussions. On the one hand, the Defendants' side, you're saying that there are performance-related and other questions that were the basis for the non-renewal.

On the other hand, that didn't lead to his termination of full employment, so one might guess that they did not reach a certain level of, you know, whatever, seriousness, inappropriateness, et cetera, because if they were of that serious a level, it would be curious that he's still employed at all.

So, you know, it can be purely related to the academic performance or, you know, whatever. I don't know what it is. But I think you all need to know what it is. So from, I guess, Plaintiff's side, do you know what the university -- I'm not asking you to say it here -- do you know all the reasons, from the university's review of the appointment that it wasn't renewed?

MR. SIMPSON: Yes. They put it in their EEOC response letter.

THE COURT: And then what's your client's position?

MR. SIMPSON: That it's pretextual. It involves, they cited unprofessional disagreement with a professor in a Spring 2018 show, in which he addressed a professor allegedly in an unprofessional manner. And they raised an issue from November of 2023, where a student suffered a -- hurt her head, and they're blaming my client for that, I guess.

THE COURT: And what, it didn't happen, he's not responsible, what's -- on the last item?

MR. SIMPSON: He is not responsible.

THE COURT: Okay. All right.

Let's talk about discovery, which I think should go forward. But I would summarize all the questions I've been asking, which is that in this area it needs to be very clear about the procedural issues that are going on, and then the connected substantive resolution of issues, and the affect

they could have, going either way, as to the issues that you're trying to raise here. And then, obviously, that the Defense, you're trying to defend.

All right. Before we set the schedule, I have the indication that corp. counsel, you're not the one who is going to be handling this case for much longer; is that right?

MS. BRONNER: Yes. The case is being reassigned. Yeah. An attorney has been assigned. They haven't noticed their appearance yet, and they had another conference at this time, so weren't able to make it to this conference. But we're in the process of the transition right now.

THE COURT: All right. You all should order the transcript, and that new attorney should read the transcript. Because I don't want anyone here to lose sight of the potential issues that can arise in the academic position area.

All right. Like, in terms of the schedule that you're proposing, serve the settlement demand 11/28, and Defendants' response 1/16. But to the extent there can be some resolution of this case on a voluntary basis, maybe the restoration of duties, to the extent they go with the one position, at least to isolate that position from the academia.

I mean, it's a tough issue here, because I'm not

sure what the damages are from this. But that's a conversation for another day. The adjunct piece is different, obviously.

In terms of moving this forward, I'll "split the baby" on the initial disclosures, given new counsel is coming in and the Thanksgiving holiday. So serve the initial document requests and interrogatories by December 12th, so 12/12/2025, there's that.

But I'm going to leave the 12/2 date that you are proposing, or I guess it's Plaintiff's proposal, for the initial disclosures. So initial disclosures 12/2, document requests and interrogatories 12/12. I think it makes sense that you see the initial disclosures before you issue that. Joinder amendment of the pleadings, January 12th. If you want to add anyone after that, you need to show good cause. Finish discovery 4/30.

You know, in my experience these cases take a lot of small instances of fact-finding to pull an academia-related case together. So I think the longer date is the better date, so 4/30/26. And then if you're doing expert discovery, the initial disclosures would be due 4/30/26. Going to go with 6/11/26 for the initial expert reports, and I think that 7/9 is too ambitious. I mean, I don't know that you actually need experts in this case, but if you are, it's kind of unrealistic, I think, to get it done

that quickly. So I'm going to say at the end of July, so 7/31/26 for the rebuttal reports.

Finish any expert depositions by the end of August. No expert likes to work that hard in the summer, so you better get on their schedule, if you're doing it. I'd like a letter confirming that you're done by 8/20/26. I also want a status letter a little bit earlier in the case, so let's say -- look at my calendar for a second -- 4/16 for status order.

Okay. And then regarding dispositive motion practice, the end of September, so let's say 9/30. And if it's a trial, the JPTO October 30th.

All right. That should give you enough time. And that status order, just before the close of fact discovery, I'd like to know if you're doing expert discovery. I don't know what it is, maybe it's emotional distress or economic, but maybe you're not doing it. I don't know. So if you're not doing it, I want you to let me know in your status letter, and we'll up the dates for the dispositive motion practice, or the JPTO.

All right. A couple of other things. You know, obviously, I'm encouraging you to think about settlement. If you want to have mediation, you can read about it, the court-annexed mediation on the Court's website. Sometimes there's a fee waiver available for public entities. If

that's the issue that holds up the City from participating in it, you could ask for a fee waiver, and that usually takes about two months to schedule and have the mediation occur. You know, hard to tell here where this is going. But if the adjunct position is something that could be back on the table here, or restoration of at least some of the duties from Plaintiff's perspective, it would make a lot of sense to have these conversations now, before the next academic semester starts. And I don't think changing counsel should be a reason that there's any lag time on this. So hopefully your replacement, in this case, can get up to speed. And as I said, the City should order the transcript from today, and the incoming attorney should read the transcript so he or she is on top of what we talked about.

All right. Anything else here?

MR. SIMPSON: Not for Plaintiff, Your Honor. Thank you for your time.

THE COURT: All right. Defense?

MS. BRONNER: And nothing for Defendants. We will order the transcript. Thank you so much, Your Honor.

THE COURT: All right. Thanks. Take care. Bye.

(Proceedings adjourned.)

TRANSCRIBER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

November 11, 2025

Patricia J Dunham

______________________________ ____________________

Patricia Jean Dunham DATE

Legal Transcriber